UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                                        :
LAURA HINTON,                                           :
                                                        :
                            Plaintiff,                  :
                                                        :                05 Civ. 8951 (GEL)
            -v-                                          :
                                                        :                **OPINION AND ORDER**
THE CITY COLLEGE OF NEW YORK and                        :
FRANK REYNOLDS,                                         :
                                                        :
                            Defendants.                 :
                                                        :
----------------------------------------------------------------x

David M. Kearney and Neal Brickman, The Law
Offices of Neal Brickman, P.C., New York, NY, for
plaintiff.

Andrew M. Cuomo, Attorney General of the State
of New York (Steven L. Banks, Assistant Attorney
General, of counsel), New York, NY, for
defendants.


GERARD E. LYNCH, District Judge:

        Disputes over tenure and promotion in universities are often bitterly fought, and

qualification for promotion often turns on highly subjective and contested evaluations of

academic work in environments where factional rivalries are endemic.  Accusations that

purportedly objective decisions are based on discrimination or personal hostility are not

uncommon.  Rivalries and vendettas may last for years, and questions of ideology, professional

methodology, personal relationships, racism, and sexism often overlap.  Disentangling these

strands is difficult, as is distinguishing objective evidence from suspicion, rumor, and

speculation.

Laura Hinton, a tenured associate professor of English at the City College of New York ("CCNY"), a branch of the City University of New York ("CUNY"), brought this action against CCNY and Fred Reynolds, Dean of CCNY's Division of Humanities and the Arts and the former chair of the English Department, asserting causes of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq. ("Title II"), the New York State Human Rights Law, N.Y. Exec. Law § 296, et seq. ("SHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107, et seq. ("CHRL"). Hinton alleges that she has suffered adverse employment actions and has been subjected to a hostile work environment because she is a woman, because she has engaged in protected activity, and because she has chronic fatigue syndrome and irritable bowel syndrome.

Defendants move for summary judgment, contending that no reasonable juror could find in Hinton's favor on any of her claims of discrimination. For the following reasons, defendants' motion will be denied as to Hinton's claims of sex discrimination and retaliation regarding her second application for promotion, and as to her claim of retaliation regarding her exclusion from grants and committee work, and granted in all other respects.

## BACKGROUND

The purpose of summary judgment is to determine whether there are triable issues of fact or whether the evidence in support of plaintiff's claims is so weak that no reasonable jury could find in plaintiff's favor. Therefore, on this motion the Court does not engage in factfinding, but only determines whether a reasonable factfinder could make certain findings. The facts in this section are either undisputed or presented in the light most favorable to Hinton.

## I.    Hinton's Career at CCNY

Hinton, whose area of expertise is contemporary and experimental women's literature, received her Ph.D. in contemporary literature from Stanford University in 1991, and began teaching at CCNY soon thereafter.  In 1993, she was promoted to a tenure-track position as an assistant professor.  Hinton was initially denied tenure by the English Department in 1997.  She appealed that denial, and in May 1998, CCNY's President overturned the English Department's decision.  (Hinton Dep. at 33-34.)  Hinton received tenure in 1998, and was promoted to Associate Professor in January 2000.  (Reynolds Decl. Ex. A at 1.)

Hinton applied for promotion to full professor in three different academic years: first in 2003-2004, second in 2004-2005, and third in 2005-2006.  Her first two applications were unsuccessful: the first was rejected as untimely and not reviewed on the merits, and the second was denied on the merits by the English Department, a decision sustained on appeal at all levels of the college.  Hinton's third application was recommended by the Department, denied by divisional and college-wide review committees, and ultimately recommended by President Gregory Williams to the CUNY Board of Trustees, who ultimately granted the promotion.  She has been a full professor since January 1, 2007.  (12/21/07 Tr. 4.)  Hinton's lawsuit centers on the rejection of her first two applications for full professorship, although she also asserts a number of lesser instances of alleged discrimination.  (Id. at 21.)  Hinton initially asserted a claim regarding her third application for full professorship, but concedes that that claim was rendered moot when the application was ultimately granted.  (12/21/07 Tr. 4.)  However, the record includes evidence relating to the third application, some of which may be relevant to the merits of Hinton's other claims.

## II.   Hinton's Applications for Promotion to Full Professorship

### A.   The Promotion Process

Hinton's central claim is that CCNY and Reynolds discriminated and retaliated against her by unfairly denying her applications for promotion to full professor in 2003 and 2004. Evaluating this claim requires an understanding of the promotions process at CCNY.

Promotions to full professorship are made after four levels of review. (Williams Decl. ¶ 7.) The process begins at the departmental level, when a professor submits an application to the departmental promotions committee. The promotions committee, which consists of all full and distinguished professors in the department, reviews the application twice. A successful first screening authorizes the candidate to solicit external review letters, and triggers a written report by the department chair. (Id. ¶ 8; Hinton Dep. at 193.) At the second screening, the committee performs a complete evaluation, reviewing the applicant's scholarship as well as numerous letters of reference. (Williams Decl. ¶ 9.)

After the departmental review, the department chair presents the application to the divisional committee, made up of the chairs of all academic departments within the candidate's division of CCNY. (Id. ¶¶ 11-12.) In the case of the English Department, the relevant division is that of Humanities and the Arts. (Id. ¶ 11.) After the divisional review, the dean of the relevant division presents the application for review by a college-wide review committee, composed of the deans of the various divisions of the college and the provost. (Id. ¶ 14; Reynolds Decl. ¶ 22.) After the college-wide review, the application is reviewed by CCNY's President, who makes a final determination whether to recommend the applicant to the

Chancellor and Board of Trustees. (Williams Decl. ¶¶ 15-17.) As is unsurprising, the "experience, credibility, and rhetorical persuasiveness" of the person who presents a candidate's application to a committee "influences how [the application] is received." (Willner Dep. at 63; see also Hinton Dep. at 65.)

If the recommendation of a particular committee is positive, then the application is automatically reviewed at the next level. (Williams Decl. ¶¶ 9, 13, 15.) If the recommendation is negative, however, the application is reviewed at the next level only if the applicant affirmatively appeals the negative decision. (Id. ¶¶ 10, 13, 15.) The deliberations of the various committees are confidential, and the voting is by secret ballot. (Id. ¶¶ 9, 12, 15.) However, if CCNY's President decides against recommending a candidate for promotion, he must provide upon request a statement of reasons for his decision. (Id. ¶ 18; Hinton Dep. at 188.)

B.    Hinton's First Application

On February 3, 2004, two days before the scheduled meeting of the departmental promotions committee, Hinton submitted her first application for promotion to Linsey Abrams, then chair of the Department. (Abrams Decl. ¶ 6.) On February 5, 2004, the committee met and unanimously voted not to consider Hinton's application on the ground that Hinton submitted her application too late and the committee did not have adequate time to evaluate the application. (Id. ¶¶ 7-8.) At the same meeting, the committee considered the application of Elizabeth Mazzola, a female colleague of Hinton's. (Id. ¶ 10.) Mazzola, who was scheduled to be on maternity leave during the Fall 2003 semester, had notified Abrams during the Spring 2003 semester of her intention to seek promotion. (Id.) The committee recommended Mazzola for

promotion, which was ultimately approved by CCNY's President and CUNY's Board of Trustees.  (Id. ¶ 11.)

C.    Hinton's Second Application

Hinton submitted her second application for promotion on October 4, 2004.  (Abrams Decl. ¶ 9.)[1]  On February 3, 2005, the Department's committee considered Hinton's application and did not recommend her for promotion.  (Reynolds Decl. ¶ 17.)  Reynolds, although a member of the English Department, was not present at that meeting, and did not vote at the departmental level.  (Id. ¶ 17.)  Hinton asked the committee to reconsider its decision, and on May 5, 2005, it again voted against promotion.  (Id.)

Hinton then appealed the departmental decision to the divisional committee.  (Reynolds Decl. ¶ 18.)  As Dean of Humanities, Reynolds chaired the meeting, but did not vote.  (Id. ¶ 21.) Joshua Willner, by then chair of the English Department, presented Hinton's candidacy to the divisional committee.  (Id. ¶ 21.)  Willner reported to the committee that he did not consider Hinton's case "a simple one."  (Reynolds Decl. Ex. A at 8.)  Willner noted that Hinton "is intelligent, imaginative, and energetic in areas that engage her interest, but her effectiveness is qualified by a tendency . . . to miss or be late to meetings that don't conform to her schedule and by a tendency to become involved in imbroglios."  (Id. at 7.)  In the report, Willner noted that he, like the English Department, declined to recommend Hinton for promotion, but also noted that "[i]f the current year passes calmly and Prof. Hinton continues to be productive, I would be

---

[1] Before submitting her application, Hinton had difficulty meeting with Abrams to discuss the application.  Hinton believed that Abrams "made every effort to not make an appointment to meet with" her, and complained to the Dean of Faculty Relations, attaching a collection of emails that Hinton believed evidenced Abrams's "lack of cooperation."  (Hinton Dep. at 73-74.)

ready to support her candidacy for promotion in the relatively near future." (Id. at 8.)  The divisional committee declined to recommend Hinton for promotion.  (Reynolds Decl. ¶ 21.)

Hinton appealed that decision in turn to the college-wide review committee.  (Reynolds Decl. ¶ 22.)  As Dean of Humanities, Reynolds presented Hinton's candidacy to the review committee, which unanimously voted not to recommend Hinton for promotion.  (Id.)  Hinton appealed that decision to President Williams, who also declined to recommend her for promotion.  (Williams Decl. ¶¶ 20-21.)  In a letter to Hinton dated June 8, 2006, Williams provided his reasons, focusing on the quality of her scholarship.  (Id. ¶ 23 & Ex. F.)[2]  Hinton's request that Williams reconsider his decision was denied.  (Hinton Dep. at 187.)[3]

### D.    Hinton's Third Application

Hinton's third, and ultimately successful, application, was submitted in the Fall 2005 semester.  (Williams Decl. ¶ 24.)  On April 27, 2006, the English Department promotions committee voted to recommend Hinton's promotion.  (Reynolds Decl. ¶¶ 26-27.)  Reynolds again was not present at either the initial or secondary screening by the committee.  (Id.)

The recommendation was not made without opposition.  Jane Marcus, a senior member of the Department who was present at the meeting, testified that Professor Mark Mirsky, who by the time of the second screening was the chair of the committee (id. ¶ 27), "was not present for the . . . discussion" regarding Hinton's candidacy, but "walked in just before the vote was

---

[2] Reynolds testified that he could not recall whether he was asked to review or edit the President's letter before it was sent to Hinton.  (Reynolds Dep. at 109.)

[3] Hinton filed a union grievance in connection with Williams's alleged delay in responding to her request for reconsideration.  (Hinton Dep. at 188.)

supposed to be taken, raised his hand and said very loudly I don't think her work is good enough." (Marcus Dep. at 36.) Nevertheless, the committee voted in favor of Hinton.

On April 28, 2006, the day after the English Department's positive recommendation, Mirsky presented Hinton's application to the divisional committee. (Reynolds Decl. ¶¶ 28-29.) Reynolds was also present at that meeting. (Id. ¶ 28, Reynolds Dep. 93.) In connection with the divisional review, Willner submitted a report supporting her candidacy. (Reynolds Decl. Ex. B.) Notwithstanding the Department's positive recommendation, the divisional committee unanimously voted not to support Hinton's promotion. (Reynolds Decl. ¶ 28.) Hinton appealed that decision to the college-wide review committee, which on December 1, 2006, voted not to recommend Hinton's application to President Williams. (Id. ¶ 29.) Reynolds, who was present at the meeting and presumably presented Hinton's candidacy to the group in his capacity as Dean of Humanities (id. ¶¶ 22, 29), testified that Hinton's second and third application records were "largely the same." (Reynolds Dep. at 75.) In spite of the negative recommendations of the divisional and college-wide committees, President Williams decided to recommend Hinton's application for promotion to full professor to the Board of Trustees, and Hinton was finally promoted. (12/21/07 Tr. 4.)

## III. Evidence of Sex Discrimination

In support of her claim of sex discrimination, Hinton argues that a male colleague, Joshua Willner, was promoted to full professor with a record she claims is weaker than hers.[4] Neither

---

[4] Hinton also contends that two female professors, Linsey Abrams and Elizabeth Mazzola, were promoted on records weaker than hers. Abrams was promoted to full professor and served as Department chair, despite not having a Ph.D. (Willner Dep. at 52.) Mazzola gained tenure in part on a book printed by a "vanity press" (Hinton Dep. at 160-65), a publishing house that is paid directly by the author to print the book (Willner Dep. at 53), and thus is less

side offers any comprehensive statistics regarding the gender of members of the English Department generally or of full professors in particular.  (See 12/21/07 Tr. 13-15.)

Hinton also points to alleged sexual harassment or mistreatment that she experienced earlier in her employment with CCNY, especially at the hands of Professors Steven Urkowitz, at one point the chair of the English Department, and William Herman, at one point a dean. Hinton's colleague Jane Marcus testified that in the past, a "gang of men," led by Urkowitz, had been "rude" to Hinton and made derogatory comments about her.  (Marcus Dep. at 40.)  Hinton testified that in 1991, when Hinton was applying for a position at CCNY, Herman, a member of the executive committee in charge of hiring, came "very close" to her and told her that she had "the sexiest legs" and would be hired.  (Hinton Dep. at 41.)  Around the time Hinton was under consideration for tenure, Urkowitz, who was then Department chair (Hinton Dep. at 35), said that Hinton should be told "not to wear her skirt so short, she can't ride on the subway with an outfit like that on," and "over and over again in the halls and in his office, [made] remarks about how [Hinton] was dressed."  (Marcus Dep. at 38-39.)  Urkowitz also "would say things about [Hinton's] hair, her eyes.  You know that her blouse was cut too low, her skirt was too short, why was she wearing high heals.  I mean he really did the whole outfit."  (Id. at 40-41.)

All the members of this "gang" are now retired (Marcus Dep. at 42), and thus apparently played no role in Hinton's applications for promotion to full professor.  Marcus believed, however, that Urkowitz's actions "probably" affected Hinton's tenure application, which was initially denied, because:

---

rigorous or selective than a major university press (Hinton Dep. at 161).  Any more favorable treatment given to these women does not support any claim of sex discrimination, but may be relevant to Hinton's claims that she was mistreated for other reasons, such as retaliation.

[t]here was all this atmosphere around in the department, poisonous atmosphere of people siding with [Urkowitz] or not siding with [Urkowitz] and you know he made it permissible. He essentially, by acting out all this sexism, it made it possible for all the other men to join him in that swaggering way. . . . In other words, he was Chair. He gave permission.

(Marcus Dep. at 45.)[5]

In addition to the above evidence, Hinton also proffers a number of hearsay statements, as well as otherwise inadmissible, conclusory, or irrelevant testimony, which must be disregarded in connection with this motion.[6]

----

[5] The record also contains an arguably sexual encounter with Reynolds in Fall 2002 that Hinton does not mention in her pleadings, at least in the context of her sexual discrimination case. When Reynolds was first made chair of the Department, he and Hinton had a conversation regarding, in part, her medical condition. Hinton testified that the conversation occurred in the English Department when "there was nobody around." (Hinton Dep. at 95.) When they were talking about Hinton's medical condition, the door was open, because Hinton's condition was apparently a matter of "general knowledge." (Id.) However Reynolds then "closed the office door . . . and said, Can I put my arms around you – my arm around you?" (Id. at 96.) Hinton felt "a little awkward" because she "didn't know him very well." (Id.) Reynolds then asked "Can I give you a hug" and then asked whether Hinton had considered taking early retirement. (Id. at 96.) Hinton initially interpreted Reynolds's actions as "a fraternal gesture" of Reynolds "trying to be kind." (Id.)

[6] For example, Hinton testified: (1) that Urkowitz's wife had once told Hinton that Urkowitz had said that "the men on a hiring committee were commenting about women's breasts" (Hinton Dep. at 130); (2) that in 1994 Urkowitz told Marcus that "[b]lack women were making complaints because of [Hinton's] blonde hair and blue eyes" (id. at 29, 48-49); (3) that some of her students "felt that they were approached by male faculty in inappropriate ways and that comments were made about them and their level of attractiveness" (id. at 129); (4) that many of her female colleagues have "[f]elt excluded from what they perceived as an inner circle of men who controlled the department and the university and that for them to become . . . promoted . . . was extremely difficult as compared to the men" (id. at 114). All of this testimony, if offered to prove sexist behavior by members of the Department, is hearsay, as the truth of the allegations depends on the credibility of Hinton's alleged informants.

Some testimony that Hinton puts forward is conclusory. (See, e.g., id. at 113-14, "Sinkwan Cheng . . . was not offered a tenured track position . . . [and] I believe that discrimination . . . led to that treatment.") Other testimony is speculative. (See, e.g., id. at 131, Fred Reynolds "approach[ed] [Elizabeth Mazzola] in a malicious manner and it truly frightened

**IV.      Evidence of Disability Discrimination**

Hinton has been diagnosed with both chronic fatigue syndrome and irritable bowel

syndrome (Hinton Dep. at 82), and she contends that these conditions are disabilities for

purposes of the ADA.  Chronic fatigue syndrome gives Hinton "less energy to do . . . the work

[she] would like to do" and requires her to "pace [herself] very carefully."  (Id. at 83.)  As a

result of her condition she "seem[s] to have limited hours when [she] can be up and performing"

and is "[n]ot like [her] old self."  (Id. at 84.)  Her irritable bowel syndrome has affected her

ability to perform her job duties in a "very similar manner" to how chronic fatigue syndrome has

affected her job – she has to pace herself and to "carefully craft schedules."  (Id. at 91.)  As a

result of Hinton's irritable bowel syndrome, she has lived with pain at times "severe to

moderate," and sometimes "debilitating," and has had "to take exceptional care of [her] health,

eat organic produce and meats," and has had "to eat on a systematic basis; very expensive, very

time consuming."  (Id. at 88-89.)  As a result of both of these syndromes, she reacts negatively to

"severe stress."  (Id. at 92.)

In late 2000, presumably as a result of these conditions, Hinton took a medical leave of

absence, in her words, "part-time disability leave," that lasted approximately until Fall 2001.

(Id. at 145.)  Her medical condition is a matter of "general knowledge" in the Department.  (Id.

at 95.)  Starting on the first day of classes in Fall 2002, and over the course of approximately six

---

her according to our discussion" and "I can only assume that there was some discriminatory
gender treatment in that because Liz Mazzola is a fine person.")  Similarly, Professor Lyn Di
Iorio, a colleague of Hinton's in the Department, testifies that she was not permitted to accept a
fellowship from the Center of Puerto Rican Studies, a decision she claims was motivated by
discriminatory animus on the basis of gender and national origin.  (Di Iorio Aff. ¶ 8.)  However,
she provides no non-speculative evidence linking the denial of the fellowship to any sexually
discriminatory animus on behalf of Reynolds or anyone else.

weeks, Reynolds spoke with or wrote letters to Hinton suggesting that they explore options for early disability retirement. (Id. at 95-98; 203-207.) Hinton informed Reynolds that she was not interested in exploring those options. (Id.)[7]

Because of her medical condition, Hinton has to plan her schedule carefully. The English Department has "honored [her] scheduling requests," and Hinton does not believe that "the scheduling of the classes . . . [has] been a problem" for her, in terms of her medical condition. (Hinton Dep. at 85.) However, at one point Reynolds scheduled Hinton to observe some adjunct faculty, and Hinton informed Reynolds that she would be unable to do the observations because of her teaching and treatment schedules. (Id. at 86.) Hinton was not disciplined for refusing to observe these adjunct faculty members. (Id. at 87.) However, Hinton has linked this incident to Reynolds's suggestions that she take early retirement. (Id.)

## V.  Evidence of Retaliation

To support her claims of retaliation, Hinton points to numerous instances in which she has complained, formally and informally, of discrimination against her by co-workers and various parts of the CCNY administration. On December 8, 1994, Hinton complained to Martin Tamny, then the Dean of Humanities, regarding Urkowitz's behavior. (Banks Decl. Ex G, at 2.)[8]

---

[7] Hinton clearly took umbrage at the suggestions, and found at least one of Reynolds's memos "invasive and presumptive." (Hinton Dep. at 206.) Hinton "[o]nce . . . asked him to please stop sending [her] letters asking [her] to retire." (Id. at 58.) Reynolds admits that he suggested to Hinton that they explore "options for taking disability retirement." (Reynolds Dep. at 115-16.) Reynolds testified that Hinton "described her condition [to Reynolds] . . . in such a way, with such language, that it seemed to [Reynolds] that [Hinton] ought to, if it were as she described it, pursue some sort of bona fide disability definitions and try to derive the benefits thereof to make her life easier to manage." (Id. at 146.)

[8] Hinton filed the complaint, in part, because she was told that Urkowitz had said to others that "[b]lack women were making complaints because of [Hinton's] blonde hair and blue

On July 8, 1998, following her contentious tenure case, Hinton filed a charge with the EEOC, alleging that Tamny and Urkowitz had discriminated against her on the basis of race, color, sex, religion, national origin, and her past complaints of discrimination. (Banks Decl. Ex G, at 2.)

Sometime during the Spring 2003 semester, Hinton also filed an internal complaint against Reynolds regarding his suggestions that she take early retirement and his alleged mistreatment of Di Iorio. (Hinton Dep. at 38-39.) That complaint was not treated with the level of confidentiality that Hinton had expected. (Id. at 67-72.) Hinton complained to President Williams about how her complaint against Reynolds had been handled. (Id. at 69.) The complaint against Reynolds was ultimately dismissed by the affirmative action officer, and Hinton apparently then filed a complaint against the affirmative action officer. (Reynolds Dep. at 70.)

Hinton filed her second EEOC charge of discrimination on February 3, 2004, and later supplemented it. (Banks Decl. Ex. D.) That complaint alleges a "campaign of discrimination and retaliation against" her. (Id.) This second EEOC charge largely forms the basis of her current lawsuit. During the course of her second application for promotion, Hinton also complained to the Dean of Faculty Relations about Abrams, claiming that Abrams was not responding to Hinton's requests to meet to discuss Hinton's application for promotion. (Hinton Dep. at 212-14.) Hinton was once told, perhaps due to her frequent complaints and conflicts

---

eyes." (Hinton Dep. at 29.) Although this evidence is hearsay and cannot be used for the truth of the matter asserted, it, as well as other hearsay statements, may be relevant to the question of Hinton's good faith in filing her various complaints. To prove that she engaged in protected activity for her retaliation claims, Hinton must establish a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988) (citations and internal quotation marks omitted).

with various colleagues, that she is a "problem in the community." (Id. at 53.)  As is unsurprising, it is "widely known" in the English Department that Hinton has sued Reynolds. (Reynolds Dep. at 100.)

In addition to complaining on her own behalf, Hinton has helped others file complaints or has taken it upon herself to complain on behalf of others.  At one point, on behalf of some of her students, Hinton made an informal complaint about the behavior of some members of the audio-visual/instructional media department.  (Hinton Dep. at 39-40.)  Hinton also helped Di Iorio to file an affirmative action complaint against Reynolds some time before Summer 2004.  (Id. at 99-102.)  That complaint related to Reynolds's alleged refusal to allow Di Iorio to accept a Puerto Rican Studies Fellowship.  (Id. at 101.)  After that complaint was made, Reynolds told Di Iorio that she would not be tenured in part because she filed an affirmative action complaint.  (Di Iorio Aff. ¶ 5.)  Di Iorio eventually secured tenure "after a big battle."  (Hinton Dep. at 104.)

In addition to the inference that this extensive and well-known history of discrimination complaints irritated her senior colleagues, Hinton also relies on evidence that Reynolds has openly and directly expressed retaliatory animus against her.  Marcus testified that, before the departmental meeting to discuss Hinton's second application for promotion to full professor, she asked Reynolds, "why are you harassing Laura Hinton and what did she ever do to you[?]" (Marcus Dep. at 34.)  In response, Reynolds "gestured to . . . file cabinets" apparently containing files relating to Hinton and said, "that's what she did to us, these two file cabinets."  (Id.)

Indeed, Hinton's personnel file, available to members of the Department, contained misplaced confidential documents relating to her EEOC complaints. (Willner Dep. at 18-20.)[9]

## VI. Further Allegations of Mistreatment

While the failure to promote claim lies at the heart of Hinton's claims of discrimination and retaliation, Hinton also claims that she has been subjected to a collection of other "nonpersonnel decisions . . . that affect [her] ability to perform [her] job." (Hinton Dep. at 21.) These actions are also apparently alleged to be the product of discriminatory and retaliatory animus on the part of the defendants.

### A. Classroom Space, Classroom Equipment, and Teaching Schedules

Hinton testified that she was not provided with "appropriate classroom space" and "appropriate audio-visual equipment." (Hinton Dep. at 21, 45-46, 221.) In the Fall 2004 semester, Hinton taught a graduate seminar in an "overstuffed undergraduate room" with "very uncomfortable chairs without ventilation" that was "overcrowded . . . hot . . . [and] noisy." (Id. at 46, 173-74.) Reynolds states that the Registrar's Office, not he, is responsible for making classroom assignments, that he had no involvement in the classroom assignment at issue, and

---

[9] Again, Hinton submits inadmissible hearsay and speculative opinion in support of her retaliation claim that may not be considered for the truth of the matters asserted. Hinton testified that Professor Mirsky told Lyn Di Iorio that "her problem was that she was associated with Laura Hinton." (Hinton Dep. at 76.) Di Iorio stated in her affidavit that she "was told by other faculty members" that, at a meeting of the English Department to discuss Di Iorio's promotion, Hinton "was repeatedly interrupted in a disrespectful and hostile manner while she attempted to support my candidacy for promotion, and was driven to tears and uncontrolled shaking as a result of the intimidation." (Di Iorio Aff. ¶ 9.) Di Iorio further states that she "believe[s] that Laura Hinton has been discriminated against based on gender, age and perceived disability, and [she] believe[s] [Hinton] has also experienced retaliation for calling attention to the Division of Humanities' gender, ethnic and other discrimination." (Id.)

that he does not recall Hinton complaining to him about her classroom space.  (Reynolds Decl. ¶ 33.)

Hinton was also unhappy with her teaching schedule in the Spring 2003 semester. Although Hinton could not remember the exact specifics of the courses she taught, she thinks she taught three courses that semester.  (Hinton Dep. at 157.)  Hinton's Spring 2003 schedule was devised in the Fall 2002 semester by Reynolds, who stated that as chair of the English Department, he scheduled the teaching assignments of faculty members based on their own stated preference.  (Reynolds Decl. ¶ 32.)  Reynolds testified that he does not recall Hinton making any objection to her teaching schedule for the Spring 2003 semester.  (Id.)[10]

Hinton also complains that she was once asked by the Women's Studies Program to teach an upper-level course, which was a "prestigious" class that would give her more "status in the community."  (Hinton Dep. at 176.)  In order to be able to teach the course, which was outside of the English Department, she needed some of her teaching obligations in the English Department "released."  Hinton testified that she was told that Reynolds did not release Hinton's time to the Women's Studies Program, and as a result, she was unable teach the class.  (Hinton Dep. at 175-76.)

---

[10] Hinton, however, submits no admissible evidence that others were provided teaching schedules that were preferable to hers, instead offering hearsay or speculative assertions.  For example, Hinton testified that it was her "belief and understanding" after talking to others that "vast numbers" of her colleagues were given "course releases," whereas Hinton's applications for course releases were denied and she had to teach "a very large schedule."  (Hinton Dep. at 152-53.)  Course releases are sought after because they reduce a professor's teaching load and allow her to focus less time on classroom preparation and more time on academic research. (Reynolds Dep. at 59.)  Hinton also testified that "one colleague told me just about everybody in English has a course release for something and I didn't."  (Id. at 156.)

B.    Inequitable or Aggressive Treatment

Hinton further has testified that throughout her employment she has been the recipient of "gestures of intimidation and humiliating remarks about [her] work" and that her "scholarship [has been] denigrated." (Hinton Dep. at 22.) Her reputation had been "maligned" and Hinton is "afraid" of certain members of the administration. (Id. at 203.) Further, her "contributions to the university for committee work [have been] ignored [or] ridiculed." (Id. at 22.)

At a meeting, after Hinton made suggestions about the English Department's mission statement, "Abrams made a sarcastic remark about [Hinton] publicly and in front of the entire department." (Hinton Dep. at 159.) It was "very embarrassing" for Hinton. (Id. at 160).[11] Hinton further testified that various members of the English Department have attacked her or denigrated her teaching. (Id. at 21, 47-48, 52.)

Hinton also pointed to her interactions with Saul Brody, another colleague, who, according to Hinton, "just generally didn't seem to like" her and "didn't seem to appreciate the contribution" she had to make. (Id. at 235-36.) Hinton has also had difficulties Martin Tamny, former Dean of Humanities, who at some point in the mid-nineties during the course of a meeting, "became very red in the face and became very angry and pounded on the desk" because

_____

[11] Willner mentioned this incident in his chair's report for Hinton's application for promotion as a "minor but indicative case in point" of how Hinton is "intelligent, imaginative, and energetic in areas that engage her interest," but how her "effectiveness is qualified by a tendency . . . to miss or be late to meetings that don't conform to her schedule and by a tendency to become involved in imbroglios." (Reynolds Decl. Ex. A, at 7.) In his view, Hinton "had some good suggestions for revising the Department's statement of Mission and Goals," however those suggestions were presented "in a page-long statement handed out on the floor of the Department meeting and many weeks after the committee charged with drafting the statement had requested feedback." (Id.) Certain members of the Department "protested what they viewed as an unwarranted preemption of the review process, and Prof. Hinton took offense and complained to [Willner] about the matter later." (Id.)

Hinton would not give up a course release to which she believed she was entitled. (Id. at 227, 236.)  In 1994, Urkowitz called her "a sentimental heroine begging for money."  (Id. at 35.)  At another time, apparently after Urkowitz's comments, Herman called Hinton a "poor baby."  (Id. at 127.)

C.      Exclusion from Ad-Hoc Hiring Committee

Hinton believes that her employers have attempted to "isolate" her from the Department by, among other things, "refusing . . . to allow [her] to serve on a hiring committee in [her] field of expertise."  (Hinton Dep. at 21, 157-58.)  When her request to be put on a committee to hire someone in comparative literature was denied, she complained to Abrams, who told Hinton that it "had been Fred Reynolds'[s] call."  (Id. at 61.)  Hinton testified that the "two ways in which you are acknowledged as a valued and important colleague" in the English Department are through "the hiring process" and the funding process.  (Id. at 158.)  Hinton believes that she has "been excluded from . . . those processes."  (Id.)

D.      Denial of Funding & Competitive Sabbatical Leave

Professor Jim DeJongh, when he was in charge of a particular program budget, promised Hinton the use of a very small amount of money – "a few hundred dollars maximum" – to fund an ongoing poetry series.  (Id. at 165.)  When Reynolds took charge of the budget, he apparently prevented Hinton from receiving the promised funds.  (Id. at 166-67.)  Despite the denial of funding, some of Hinton's students were able to raise money to ensure that the poetry series continued.  (Id. at 168-70.)

Hinton also applied for a full-pay one semester sabbatical, but did not receive the sabbatical.  (Id. at 171.)  She was offered the opportunity to apply for a full-year half-pay

18

sabbatical, but she did not apply for it because she was unable to secure external funding to supplement her income.  (Id.)  Hinton could not specifically identify other individuals who were granted full-pay sabbatical leaves, or how their qualifications compared to hers.  (Id. at 172.)

Hinton alleged that Reynolds, as chair, refused to sign a grant application until she provided "extensive information," even though the "usual practice" is for the chair to sign such applications "pro forma."  (Complaint ¶ 29.)  Reynolds did sign the application, however, and Hinton received the grant.  (Hinton Dep. at 151.)  Hinton could not point to others who were treated differently by Reynolds with respect to grant applications, though she testified that when Jim Watts was the Dean of Humanities, he signed her grant applications without even looking at them.  (Id. at 151-52.)

E.     Other Inequitable Treatment

At one point, when Hinton called in sick with the flu, she "received a very odd response from the secretary" who told her that she had to "report directly to the chair" when she called in sick.  (Hinton Dep. at 88, 92-93, 150.)  Hinton could not point to any other professor who received more favorable treatment when calling in sick.  (Id. at 94.)  Hinton did not lose any salary when out sick, and she was not disciplined in any way for calling in sick.  (Id. at 98.)

Hinton also once had a confrontation with a student, and Willner investigated the incident.  (Id. at 54-56, 58, 67.)  Although he "drew no definite conclusions regarding the facts of the matter," nonetheless he "was sufficiently concerned about what had transpired to write . . . Hinton an advisory letter" and meet with her twice.  (Reynolds Decl. Ex. A, at 7.)  In connection with that incident, Hinton was asked to attend a meeting at which Jim Watts, then the Dean of Humanities, told her that she was a "problem in the community."  (Hinton Dep. at 53.)

Hinton was not disciplined as a result of the incident, but "the meeting itself was a form of discipline, a kind of shame."  (Id. at 59.)

## VII.    Procedural History

The EEOC issued Hinton a right to sue letter on August 1, 2005.  (Banks Decl. Ex. F.) She filed this lawsuit on October 21, 2005.

## DISCUSSION

## I. _____ Summary Judgment Standard

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party moving for summary judgment bears the initial burden of explaining the basis for its motion and identifying those portions of the record which it believes "demonstrate the absence of a genuine issue of material fact."  Id. at 323.  The burden then shifts to the nonmovant to produce evidence sufficient to create a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(e)(2) (When a summary judgment motion is "properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in [Rule 56] – set out specific facts showing a genuine issue for trial."); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden

under [Rule 56], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").

The Court's responsibility is to determine if there is a genuine issue to be tried, and not to resolve disputed issues of fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences and resolve all ambiguities in the nonmovant's favor, and construe the facts in the light most favorable to the nonmovant. Id. at 255 ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."). However, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to withstand a motion for summary judgment. Id. at 252.

A nonmovant's unsupported denials of the movant's evidence, without more, cannot create disputes of material fact. See Fed. R. Civ. P. 56(e)(2) (When a summary judgment motion is "properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading" but must "by affidavits or as otherwise provided . . . set out specific facts showing a genuine issue for trial."). The affidavits must be supported by personal knowledge. Danzer v. Norden Systems, Inc., 151 F.3d 50, 57 n.5 (2d Cir. 1998). The evidence must be admissible. Likewise, "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion." Davis v. State of New York, 316 F.3d 93, 100 (2d Cir. 2002); see also id. ("The nonmoving party must go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.") (alterations in original) (citation and internal quotation marks omitted).

II.      **Sex Discrimination Claims**

A.      Legal Standards

Title VII provides that "[i]t shall be an unlawful employment practice for an employer

. . . to discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national

origin."  42 U.S.C. § 2000e-2(a).[12]  In a suit alleging employment discrimination on the basis of

gender, a Title VII plaintiff bears the "ultimate burden of persuasion," St. Mary's Honor Ctr. v.

Hicks, 509 U.S. 502, 511 (1993), as well as the initial burden of establishing, by a preponderance

of the evidence, a prima facie case of gender discrimination.  Collins v. New York City Transit

Auth., 305 F.3d 113, 118 (2d Cir. 2002).  To establish a prima facie case, a plaintiff must

demonstrate that (1) she is a member of a protected class, (2) she is qualified for her position, (3)

she suffered an adverse employment action, and (4) the circumstances give rise to an inference

of discrimination.  Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000); see also

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Dawson v. Bumble & Bumble,

398 F.3d 211, 216 (2d Cir. 2005); Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir.

2001).

An adverse employment action is a "materially adverse change in the terms and

conditions of employment."  Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755

(2d Cir. 2004) (citation and internal quotation marks omitted).  A change in the conditions of

---

[12] The elements of a discrimination claim asserted under the SHRL and CHRL are the
same as those of a discrimination claim asserted under Title VII.  See Forrest v. Jewish Guild for
the Blind, 3 N.Y.3d 295, 305 n.3 (2004); Dawson v. Bumble & Bumble, 398 F.3d 211, 2167 (2d
Cir. 2005).

employment must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003). Examples of materially adverse actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, and significantly diminished material responsibilities." Sanders, 361 F.3d at 755 (citation and internal quotation marks omitted). The failure to promote an otherwise qualified individual constitutes an adverse employment action. Petrosino v. Bell Atlantic, 385 F.3d 210, 226 (2d Cir. 2004). To establish a prima facie case of a discriminatory failure to promote under Title VII, a plaintiff must ordinarily demonstrate that "(1) she is a member of a protected class, (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." Id. (citations and internal quotation marks omitted).

The burden of establishing the prima facie case in an employment discrimination case is "minimal," McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001) (citations and internal quotation marks omitted), "not onerous," Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981), "de minimis," Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001). If the plaintiff establishes a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. McDonnell, 411 U.S. at 802-03. Once articulated, the burden shifts back to plaintiff to provide "sufficient evidence to support a rational finding that the non-discriminatory . . . reasons proffered by the defendant for the challenged employment action were false," Abdu-Brisson, 239

F.3d at 470, and "more likely than not [discrimination] was the real reason for the employment action," Weinstock, 224 F.3d at 42 (citation and internal quotation marks omitted).

B.    Denial of Promotion

1.    Hinton's First Application

Defendants argue that, even assuming that Hinton has made a prima facie showing of discrimination with respect to her first application for promotion to full professor, they have articulated a non-discriminatory reason for the employment action – namely, that Hinton submitted a late application – and that no reasonable factfinder could conclude that that reason was a pretext for sex discrimination.  It is undisputed that Hinton submitted her application on February 3, 2004, only days before the English Department met to consider the merits of the candidates' applications for promotion.  It is also undisputed that the only other person up for promotion at the same time, Elizabeth Mazzola, had notified Abrams of her intentions approximately a year in advance of the meeting.  It is further uncontested that on October 15, 2003, the Abrams sent a bulletin to all faculty members stating that those wishing to apply for promotion should "speak with [Abrams] as soon as possible."  (Abrams Decl. ¶ 4.)

Hinton claims that she did not receive the bulletin, and was not provided with the exact date for when applications for promotion were due.  (Hinton Aff. ¶ 3.)  Hinton knew, however, that the application process normally began in the fall semester, and she never spoke to Abrams in the fall about her desire to seek promotion.  (Hinton Dep. at 191-92; see also Abrams Decl. ¶ 3.)  Hinton did not miss the deadline by days, but by months.  Hinton points to no evidence in the record to suggest that anyone prevented her from submitting her application to Abrams in the fall, or from otherwise signaling her intentions.  Nor is it merely a question of missing, or even

badly missing, an essentially arbitrary deadline.  Hinton applied literally on the eve of the meeting that was to consider the candidates for promotion.  Undoubtedly an application must be submitted a reasonable time in advance of the initial screening to permit distribution of the application to the members of the committee, and for the committee to review the application and make an informed decision about its merits.  Hinton submits no evidence to suggest that it was even possible, let alone reasonably practical, for the committee to evaluate her application in the short time between her submission and the committee meeting.

Hinton suggests that (1) she was somehow misled into not applying in the fall and that (2) Elizabeth Mazzola, her colleague who did apply for and ultimately secure promotion, was given more favorable treatment – an "accomodat[ion]" – because Mazzola's application was made "well past the first screening" deadline, which was supposed "to have taken place in the [f]all" according to CUNY's procedures.  (Hinton Dep. at 195.)

Hinton, however, provides no evidence that she was affirmatively misled.  She asserts that Yanna Joseph, a female administrative assistant not in the English Department, but in the Office of the Dean of Faculty Relations, misinformed her about the deadline for the application.  (Abrams Decl. Ex. B.)  After speaking to Joseph, Hinton understood that a candidate for promotion had to declare her intentions in the fall semester.  (See Hinton Dep. at 195.)  Even if a reasonable factfinder were to conclude that this information was incorrect, no reasonable factfinder could infer that Joseph had, or was connected to anyone who had, any animus towards Hinton of any sort.  There is no basis in the record that would permit a reasonable factfinder to infer that, if Joseph provided Hinton with inaccurate information, she did so with an intent to discriminate or retaliate, rather than as an innocent mistake.  See, e.g., Alfano v. Costello 294

F.3d 365, 378 (2d Cir. 2002), citing <u>Bowman v. Shawnee State Univ.</u>, 220 F.3d 456, 464 (6th Cir. 2000) (objectionable but facially sex-neutral behavior by one person could not be considered in hostile work environment claim where there was no evidence of that person's bias).[13]

Hinton also makes much of the fact that whereas Professor Elizabeth Mazzola's application was considered in February, Hinton's was not.[14]  Comparing Mazzola's treatment to Hinton's does not bolster Hinton's allegations of gender discrimination.  Mazzola followed the departmental policies by declaring her intention to apply for promotion well in advance of the committee meetings, indeed, a full semester earlier than was required.[15]  (Abrams Decl. ¶ 10.)  In contrast, Hinton never declared her intentions in the fall, despite her testimony that she believed that was when she was supposed to do so.  Moreover, even if Mazzola received preferential treatment in some way, differential treatment of another female candidate does not support an inference that Hinton was discriminated against on the basis of her sex.  Of course, that Mazzola was a woman and was promoted does not necessarily insulate CCNY from claims of gender discrimination against other women.  That one member in a protected class lost out to another

---

[13]  Hinton also submits an affidavit stating that she "wrote Abrams' office directly and repeatedly requested, in writing, a copy of the guidelines and procedures governing promotion but [my] letters were not returned."  (Hinton Aff. ¶ 3.)  However, the affidavit does not state when she requested these guidelines.  In Hinton's deposition, she accuses Abrams of refusing to respond to her requests for information regarding the application process in connection only with her second application, not her first.  (<u>Compare</u> Hinton Dep. at 73-74, <u>with</u> <u>id</u>. at 190-95.)

[14]  Hinton stated that she had "never seen an initial screening take place in February." (Hinton Dep. at 190.)  However, the initial screening of Hinton's second application, which she submitted on October 4, 2004, occurred on February 3, 2005, almost exactly one year after the initial screening of her first application.

[15]  Mazzola, unlike Hinton, could not have declared in the Fall 2003 semester her intention to apply for promotion because she was on maternity leave and not physically present on campus.  (Abrams Decl. ¶ 10; Hinton Dep. at 195-96.)

person in the protected class is "irrelevant, so long as [the complaining party] lost out because of [her protected status]." Terry, 336 F.3d at 140 (citation and internal quotation marks omitted). However, Hinton has the burden of demonstrating that she was not promoted because of her sex. To the extent that Hinton attempts to raise an inference of discrimination by comparing her treatment with that of others allegedly similarly situated, such an inference plainly fails to the extent the others who supposedly received better treatment were not men, but other women.[16]

Hinton has not demonstrated any linkage between her sex and the English Department's refusal to consider her first application for promotion as untimely so as to create a genuine issue of fact as to whether the denial was a pretext for gender discrimination. She produces no evidence that it was even possible to make a reasoned decision in the short amount of time between her application and the initial screening. There is no genuine issue of material fact as to whether defendants have offered a legitimate, non-gender-discriminatory rationale for their failure to promote Hinton, and no reasonable factfinder could conclude, that Hinton's sex was "more likely than not" the real reason for the employment action. See Weinstock, 224 F.3d at 42.

---

[16] Hinton's complaint suggests that Mazzola and Hinton were treated differently because Mazzola "behaved in a submissive and traditionally feminine manner" (Complaint ¶ 53), whereas Hinton did not. "[I]ndividual employees who face adverse employment actions as a result of their employer's animus toward their exhibition of behavior considered to be stereotypically inappropriate for their gender may have a claim under Title VII." Dawson, 398 F.3d at 218. However, Hinton points to no evidence in the record suggesting that Mazzola behaved in a manner less "stereotypically inappropriate for [her] gender" than did Hinton.

2.      Hinton's Second Application

a.      Exhaustion of Administrative Remedies

Defendants initially argue that Hinton's claim of gender discrimination in connection

with her second application for promotion must be dismissed because she did not exhaust her

EEOC remedies with respect to that claim.  "As a precondition to filing a Title VII claim in

federal court, a plaintiff must first pursue available administrative remedies and file a timely

complaint with the EEOC."  Deravin v. Kerik, 335 F.3d 195, 200 (2d Cir. 2003) (citations

omitted).  This requirement is "an essential element of Title VII's statutory scheme."  Butts v.

City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993), superceded

by statute on other grounds as stated in Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684, 693

(2d Cir. 1998).

However, non-exhausted claims may be pursued if they are "reasonably related" to those

claims filed with the EEOC.  Deravin, 335 F.3d at 200.  A non-exhausted claim is "reasonably

related" to the exhausted claims (1) where the conduct complained of in the non-exhausted claim

would "fall within the scope of the EEOC investigation which can reasonably be expected to

grow out of the charge that was made," (2) where the conduct complained of in the non-

exhausted claim alleges retaliation by the employer against an employee for filing an EEOC

charge, and (3) where the non-exhausted claim concerns "further incidents of discrimination

carried out in precisely the same manner alleged in the EEOC charge."  Deravin, 335 F.3d at

200-01 & n.3 (citations and internal quotation marks omitted).  In determining whether claims

are reasonably related, the "focus should be on the factual allegations made in the [EEOC]

charge itself . . . ."  Id. at 201 (citation and internal quotation marks omitted).  "[I]t is the

substance of the charge and not its label that controls." Id. (citation and internal quotation marks omitted).

Hinton's EEOC complaint alleges that the "cursor[y]" denial of her first application for promotion was "part of an ongoing campaign of discrimination and retaliation against [her] by the College Administration." (Banks Decl. Ex. D.) Defendants claim that the subsequent acts of discrimination were not carried out in "precisely the same manner [as] alleged in the EEOC charge" because the decision to deny Hinton's second application for promotion was made not only by Linsey Abrams, who was named in the EEOC complaint, but by others not specifically named. (D. Reply 6.)

Although "precisely" must have meaning, see Alfano, 294 F.3d at 382, defendants read the term too narrowly. In Almendral v. N.Y. State Office of Mental Health, 743 F.2d 963, 967 (2d Cir. 1984), plaintiff alleged that she was unfairly passed over for promotion numerous occasions over a term of years. Although the alleged acts occurred in slightly different ways, the Second Circuit held that those occurring after the filing of the EEOC complaint were "essentially the same" as the conduct identified in the EEOC complaint because they all involved the "alleged manipulation of the civil service rules for discriminatory reasons in order to appoint someone other than [plaintiff]." Id. at 967. Here, Hinton's EEOC compliant involved the alleged manipulation of CCNY's procedures for promotion by the "College Administration," not just Abrams, for discriminatory reasons in order to prevent Hinton's promotion. See Butts 990 F.2d at 1403 (citing Almendral, 743 F.2d at 967, as an example of subsequent acts of alleged discrimination "carried out in precisely the same manner alleged in the EEOC charge"). To read the term more narrowly would allow an individual or institution to achieve the same result as

that complained of to the EEOC (the unfair denial of promotion) for the same illegal reasons (discrimination and retaliation), but nonetheless prevent a plaintiff from raising these functionally identical issues in their lawsuit based on the EEOC charge simply by slightly varying the exact means of discrimination. That an employer uses different pretexts to deny a woman promotion year after year as part of a regular policy of discrimination does not require the victim to file repeated EEOC charges and repeated separate lawsuits.

In any event, the conduct complained of relating to Hinton's second application would fall within the scope of any EEOC investigation relating to the denial of Hinton's first application. Hinton's EEOC charge alleges that she is qualified for the position of full professor and that the denial of her promotion to that position was part of an "ongoing campaign of discrimination and retaliation against [her] by the College Administration." (Banks Decl. Ex. D.) Since Hinton's EEOC complaint "plainly stated that the acts of discrimination were on a 'continuing' basis," the subsequent acts could "reasonably [have been] expected to grow out of the [EEOC] charge of discrimination." Almendral, 743 F.2d at 968 (citation and internal quotation marks omitted). Hinton's charge of discrimination, which specifically objected to the denial of her February 2004 application for promotion, was filed on February 3, 2004. (Banks Decl. Ex. D.) The English Department again voted not to recommend her for promotion on February 3, 2005, and adhered to that decision on May 5, 2005, during the pendency of the EEOC's investigation, which ended with the issuance of a right-to-sue letter on August 1, 2005. (Banks Decl. Ex. E.) It is inconceivable that an agency charged with investigating the reasons for a promotion denial in 2004 would not inquire into a decision denying the same complainant promotion to the same position a year later, which manifestly could cast light on the reasons for

the employer's opposition to the promotion. Because they are reasonably related to her exhausted claims, Hinton's claims regarding her second application for promotion are deemed exhausted.

### b. The Merits of Hinton's Claim

To establish a prima facie case of sex discrimination for failure to promote, Hinton must show that she is a woman, that she applied and was qualified for a job for which the employer was seeking applicants, that she was rejected for the position in part because of her gender, and that the position remained open and the employer continued to seek applicants having the plaintiff's qualifications. Petrosino, 385 F.3d at 226.

A reasonable factfinder could conclude that, at the time of her applications for full professorship, CCNY was "seeking applicants" for full professorship, and that the promotions process was non-competitive – that is, depended not on whether a particular candidate was the best among a particular group of applicants, but whether a particular candidate met certain objective factors. (See Williams Decl. ¶¶ 4-6.)

Moreover, a reasonable factfinder could conclude that Hinton was qualified for the position. Jane Marcus, one of the senior members of the English faculty, and at the time the highest ranked professor in the Department, testified that Hinton was eminently qualified for promotion and that her work is "very, very powerful," "innovative" and "very, very good." (Marcus Dep. at 30.) The letters in support of Hinton's application were "extremely good from very well-known scholars in the field." (Id. at 29.) Marjorie Perloff, who is "probably the best literary critic in America" and who also "doesn't know [Hinton]," nonetheless recommended her for promotion. (Id. at 35.) Marcus "tremendously admire[s] how much [scholarship Hinton]

31

does." (Id. at 32.)  Even more importantly, the English Department (including Willner, the former chair) and President Williams ultimately recommended Hinton for promotion on the basis of her third application.  Reynolds, who was centrally involved in the evaluation of her promotion application, testified that Hinton's second and third application records were "largely the same."  (Reynolds at 75.)  If the English Department and President Williams found Hinton qualified for promotion on the basis of her third application, a reasonable factfinder could conclude that Hinton had also been qualified for promotion on the basis of her second, essentially similar, application.[17]

A reasonable factfinder could also conclude that Hinton's application for promotion to full professor was stronger than that of at least one male applicant who had been promoted, Joshua Willner.  "A showing that the employer treated a similarly situated employee differently is 'a common and especially effective method' of establishing a prima facie case of discrimination."  McGuinness, 263 F.3d at 53, quoting Abdu-Brisson, 239 F.3d at 468.  Marcus testified that Willner "doesn't publish a thing" and was nevertheless promoted to full professor.  (Marcus Dep. at 51.)  Based on Willner's publishing record, Marcus, a longtime senior member of the Department, testified that he "got where he is in ways that no woman ever would have ever, you know, never would have gotten [past] assistant professor and . . . would have been thrown out [at the] three year review."  (Marcus Dep. at 54; see also Hinton Dep. at 27-28.)

---

[17] Of course, a reasonable factfinder could conclude that Hinton's third application was in fact stronger than her second application.  A reasonable factfinder could also conclude that both applications were equally weak, but that President Williams granted Hinton's third application out of fear of further litigation.  However, these are factual issues that must be resolved at trial.

Willner was promoted to full professor around 2000. (Hinton Dep. at 27.) Defendants argue that Willner and Hinton are not similarly situated because of their "differences in scholarship, academic discipline, and because their applications were decided years apart." (D. Mem. at 15.) However, these are arguments for the finder of fact. Academic scholarship tends to be <u>sui</u> <u>generis</u>, and promotion decisions are rarely made en masse. In such an environment, where life tenure is the norm, change often occurs slowly, and only a handful of individuals may be promoted to full professor over a period of years, a reasonable factfinder may conclude that a period of four years between promotion decisions does not preclude two candidates from being considered similarly situated. In order to "establish the minimal prima facie case by making reference to the disparate treatment of other employees," all that is required is that those employees "have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." <u>McGuinness</u>, 263 F.3d at 53-54. Notwithstanding the difference in timing of their applications and their differing fields of scholarship, a reasonable factfinder could conclude that Willner's application, when compared to Hinton's, supports "at least a minimal inference" of disparate treatment attributable to discrimination.[18] A reasonable juror could equally well find Willner better

_____

[18] Hinton has also presented evidence of two women who have been promoted on records that a reasonable factfinder could conclude are weaker than Hinton's – Elizabeth Mazzola and Linsey Abrams. <u>See</u> note 4 <u>supra</u>. Hinton's pleadings imply that these women were treated better than she was treated because they "behaved in a submissive and traditionally feminine manner." (Complaint ¶ 53.) However, Hinton points to no evidence to support the proposition that Mazzola or Abrams behaved in a "stereotypically appropriate" manner for their gender. <u>See</u> <u>Dawson</u>, 398 F.3d at 218. Therefore, comparing Hinton to Mazzola or Abrams does not provide even a minimal inference of discrimination against Hinton on the basis of Hinton's "stereotypically inappropriate" behavior as contrasted to Mazzola's or Abrams's "stereotypically appropriate" behavior. Indeed, a reasonable factfinder might well conclude that the promotion of both women (Mazzola and Abrams) and men (Willner) to full professor on records that

qualified than Hinton, or otherwise find them not similarly situated, but Hinton has presented sufficient evidence to make this a genuine issue for trial.

Hinton has also presented substantial evidence of sexual mistreatment not only by members of the English Department, but by a former chair of the Department and a dean, over a substantial period of years. Some of the instances of sex discrimination were not only quite serious, but were related to her employment status.[19] "[E]vidence of earlier promotion denials may constitute relevant 'background evidence in support of a timely claim'" of discrimination. Petrosino, 385 F.3d at 220, quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2004). A factfinder may conclude that the evidence is of limited relevance because the individuals whom Hinton specifically identifies as having harassed or otherwise discriminated against her had either retired before she sought promotion to full professor or are not specifically identified as playing a part in addressing that application. However, at least given the other evidence of discrimination in the record, the context of an allegedly harassing, sexist atmosphere in the Department over a period of years is relevant evidence, and it is for a jury to assess its significance.

Defendants further argue that Hinton's claim must fail because she has not submitted evidence that President Williams, who was entitled to make an "independent judgment" about

_____

Hinton and Marcus regard as inferior to Hinton's either casts doubt on their judgment, or suggests that the reasons for opposition to Hinton, fair or unfair, were specific to Hinton and not motivated by animus against women.

[19] A reasonable factfinder could conclude that one factor that motivated Dean Herman to hire Hinton initially was that she had the "sexiest legs." Furthermore, Urkowitz was chair of the Department at the time Hinton applied for tenure, and throughout that period made harassing comments to her.

Hinton's application, and who ultimately decided against her second application, was motivated by discriminatory animus. (D. Mem. 16.) Affidavits and declarations submitted in support of their motion emphasize that "[a]t each level of the review process, an independent judgment is made, based upon an objective assessment of the candidate's application and file." (Williams Decl. ¶ 7.) CCNY's President has the "sole authority to recommend a candidate for promotion to the Chancellor and the CUNY Board of Trustees." (Id. ¶ 16.)

Defendants' contention that Hinton must demonstrate that Williams himself was motivated by discriminatory or retaliatory animus to survive summary judgment is unconvincing. Even if Williams had the sole authority to recommend a candidate for promotion, the extent to which he relied on the proceedings at the lower levels of review to come to his actual decision regarding Hinton's second application for promotion is a disputed factual question. It is also a disputed factual issue the extent to which those lower levels of review were tainted by animus. A reasonable factfinder could conclude that Williams had not been motivated by animus when he denied Hinton's application, but nonetheless that he relied on the recommendations of the committees below him that themselves were tainted with discriminatory or retaliatory animus against Hinton. A reasonable factfinder could conclude, both as a matter of the record and of common sense, that the extensive review process across various levels exists precisely for the purpose of filtering information to President Williams and the Board of Trustees. If CCNY's President actually made a completely independent decision regarding each applicant, then the preliminary review process would be pointless. In any event, defendants' insistence that to succeed plaintiff must show that Williams was motivated by such animus has no principled basis, because not even he makes the ultimate decision. Although Williams has the

"sole authority" to recommend a candidate for promotion to the CUNY Board of Trustees, it is

the Board that has "final authority regarding all promotion decisions."  (Williams Decl. ¶ 16.)

Requiring a Title VII plaintiff to prove that the ultimate decisionmakers, such as a corporation's

CEO and COO who may sign off on all promotions, or a university's board of trustees who may

in fact give minimal scrutiny to recommendations received from below, were motivated by

prohibited animus, would erect an insurmountable barrier for many plaintiffs who have

experienced discrimination or retaliation that Title VII is intended to remedy.  The role that the

intermediate review process played in the ultimate determination of Hinton's second application

is a factual issue that must be resolved at trial.

Defendants claim that, even assuming Hinton established a prima facie case of gender

discrimination for her denial of promotion, they have established a non-discriminatory reason for

her non-promotion – namely, that the quality of her scholarship was inadequate.  However, as

discussed, there is a genuine issue of material fact as to whether Hinton was qualified for the

promotion.  The same evidence creates a genuine issue of material fact as to whether defendants'

proffered non-discriminatory rationale for their action has a good faith basis or was pretextual.

C.     Hostile Work Environment

Hinton further claims that in addition to being unfairly denied promotion, she has been

subjected to a hostile work environment.  "When the workplace is permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment, Title VII is violated."

Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 78 (1998) (citation and internal

quotation marks omitted).  Title VII does not create a "general civility code," id. at 81, and "not

36

all workplace conduct that may be described as harassment affects . . . employment within the meaning of Title VII." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (citations and internal quotation marks omitted).

The Supreme Court set forth a non-exhaustive list of relevant factors to evaluate whether a work environment was so permeated with discrimination that it rises to an actionable level, including the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, or a "mere offensive utterance," whether the conduct unreasonably interferes with plaintiff's work, and what psychological harm, if any, resulted to the plaintiff. See Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). A court must view the totality of the circumstances to determine whether plaintiff's evidence may support a hostile work environment claim. Id.; Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997). However, the "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." Harris, 510 U.S. at 21, quoting Meritor, 477 U.S. at 67. To constitute a hostile work environment, there must be "more than a few isolated incidents of [discriminatory] enmity," Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir. 1986), meaning that "[i]nstead of sporadic . . . slurs, there must be a steady barrage of opprobrious [discriminatory] comments." Schwapp, 118 F.3d at 110 (citation and internal quotation marks omitted). Thus, "whether [discriminatory] slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs," considered "cumulatively in order to obtain a realistic view of the work environment." Id. at 110-11 (citations and internal quotation marks omitted). To constitute a hostile work environment "the misconduct must be severe or pervasive enough to create an

objectively hostile or abusive work environment and the victim must also subjectively perceive that environment to be abusive." Terry, 336 F.3d at 148 (citations and internal quotation marks omitted). The legal standard applied to a hostile work environment claim under the New York City and New York State Human Rights Laws is the same as that applied under Title VII. See Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 305 n.3 (2004); Dawson, 398 F.3d at 217.

No reasonable factfinder could conclude that Hinton's evidence of alleged mistreatment meets the "remarkably high hurdle with respect to the level and frequency of offensive conduct that must be present in order to sustain" a hostile work environment claim. DelaPaz v. New York City Police Dep't, No. 01 Civ. 5416, 2003 WL 21878780, at *3 (S.D.N.Y. Aug. 8, 2003).

First, the explicitly discriminatory comments that Hinton identifies were sporadic and occurred long in the past. As offensive as they are, the comments of an expressly harassing nature by Urkowitz and Herman, who were both retired by the time of Hinton's 2004 EEOC charge, date back to the time of her hiring in 1991, or the time of her promotion to tenure in 1997-98. Other than conclusory allegations of "rudeness," there is little or nothing to indicate that such comments were sufficiently "pervasive" to constitute a hostile work environment even at that time, see Alfano, 294 F.3d at 379, still less to carry the offensive atmosphere forward to the time of Hinton's promotion applications, or within the limitation period preceding her complaint to the EEOC.

Nor can Hinton establish a hostile work environment within the limitations period by means of her various allegations of unequal treatment. Not only are these matters consistently trivial, but there is an utter lack of evidence connecting them to any sexist animus. For example, while Hinton complains about her classrooms and teaching schedules, she points to no person,

male or female, given better classrooms or teaching schedules than she was during the relevant time periods. Similarly, Hinton complains about being denied discretionary sabbatical leave, but cannot provide any details regarding the application process or the qualifications of those individuals, if any, who received the full-year paid sabbatical. A "plaintiff in an employment discrimination case cannot satisfy her burden through speculation and conjecture." Goldman v. Admin. for Children's Servs., No. 04 Civ. 7890, 2007 WL 1552397, at *6 (S.D.N.Y. May 29, 2007), citing Schwapp, 118 F.3d at 110 ("[A] plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.").

Hinton also complains about skepticism by the administration regarding her account of a confrontation with a student, the denial of discretionary grants, exclusion from one ad-hoc hiring committee, a delay by Reynolds in signing a grant application, certain comments made to her when she called in sick, and various rude or aggressive comments. Evaluating these various allegations in the light most favorable to Hinton, and taking them together in the aggregate, no reasonable factfinder could conclude that they rise to the level of a hostile work environment for purposes of Title VII. One's working environment is not rendered intolerable because an administrator actually reviews an application before approving it, rather than signing it without reading it, or because a secretary suggests that a sick call should go to her boss rather than to her. Moreover, assuming, for purposes of this motion, that Hinton suffered all these slights, she still must provide some evidence to link these incidents to discriminatory animus. See Alfano, 294 F.3d at 378. Hinton, however, offers no evidence linking these miscellaneous grievances to her sex. Repeatedly, she fails to identify male faculty who were treated better with respect to sick leave, sabbaticals, or scheduling. And when she does testify that she was singled out, the

mistreatment is, even in her own account, directed at her personally, as distinguished from both male and female colleagues, and is suffered at the hands of both male and female chairs.[20]

For support, plaintiff relies on Petrosino v. Bell Atlantic, 385 F.3d 210 (2d Cir. 2004). However the environment there was much more severe than that here. The conduct found to be severe and pervasive in Petrosino included an instance of sexual assault, a drawing of the plaintiff performing a sex act on a supervisor, constant derogatory remarks about plaintiff's body and gender generally (including disparaging remarks about her menstrual cycle affecting her job performance), and copious amounts of sexual graffiti on the walls of plaintiff's work site. Id. at 214-15. Hinton's claims do not even rise to the level present in other situations where courts have denied hostile work environment claims. See Alfano, 294 F.3d at 378 (collecting cases). Therefore, defendants' motion for summary judgment will be granted with respect to plaintiff's hostile work environment claim.

## III.    Disability Discrimination

Hinton also claims that she was unfairly denied promotion and subjected to a hostile work environment on the basis of her alleged disabilities – chronic fatigue syndrome and irritable bowel syndrome. (12/21/07 Tr. 21.) Hinton's state disability discrimination claims are governed by the same standards as govern federal ADA claims. Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 184 n.3 (2d Cir. 2006). Title I of the ADA "prohibits employers from discriminating against disabled employees." McInerney v. Rensselaer Polytechnic Inst., 505 F.3d 135, 138 (2d Cir. 2007), citing 42 U.S.C. § 12112(a). However, Hinton brings her claims

---

[20] To the extent that Hinton claims that she was uniquely mistreated, such differential treatment may evidence retaliatory motive, as discussed below, but not sex discrimination.

of discrimination pursuant to Title II, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

As an initial matter, it is not clear that Hinton has a statutory disability.  Not every physical or psychological impairment is a 'disability' within the meaning of the ADA.  Only those impairments that "limit a major life activity" in a "substantial" manner are statutory disabilities.  Capobianco v. City of New York, 422 F.3d 47, 56 (2d. Cir. 2005), citing 42 U.S.C. § 12102(2)(A).  Whether an impairment limits a major life activity in a substantial manner must be determined on a "case-by-case" basis.  Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002).  Nevertheless, it is noteworthy that Hinton has not cited, nor has the Court found, any case where a federal court has held that either irritable bowel syndrome or chronic fatigue syndrome is a disability within the meaning of the ADA.  Cf. Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 n.2 (9th Cir. 1996) ("assum[ing], without finding, that . . . Chronic Fatigue Syndrome is a 'disability'" within the meaning of the ADA, but ultimately denying plaintiff's claim).  To establish a disability, Hinton must establish, first, that she suffers from a physical or mental impairment, second, that the impairment relates to a major life activity, and third, that the impairment substantially limits that major life activity.  See Bartlett v. N.Y. State Bd. of Law Exam'rs, 226 F.3d 69, 79 (2d Cir. 2000).[21]

---

[21] "[T]he definitions of disability under the New York State Executive Law and the New York City Administrative Code are broader than the ADA definition" because the state definitions do not require that, to be considered a disability, the medical condition "substantially limit[] a major life activity."  Giordano v. City of New York, 274 F.3d 740, 753-54 (2d Cir. 2001) (citations and internal quotation marks omitted).  Claims of discrimination under New

Hinton would also be "disabled" if she were "regarded" by her employer as disabled within the meaning of the ADA. 42 U.S.C. § 12102(2); Capobianco, 422 F.3d at 57. Such a claim turns not on the actual existence of a disability but on "the employer's perception of the employee" and is a "question of intent." Capobianco, 422 F.3d at 57 (citations and internal quotation marks omitted). "It is not enough that the employer perceive the employee as somehow disabled; the employer must regard the employee as disabled within the meaning of the ADA, i.e., having an impairment that substantially limits a major life activity." Id.

Even could Hinton prove that she was disabled for the purposes of the ADA, it is still unclear that she could bring her claims of employment discrimination pursuant to Title II of the ADA. Title I largely mirrors Title VII of the Civil Rights Act, and incorporates identical administrative exhaustion requirements that a plaintiff must satisfy before bringing a claim in federal court. See 42 U.S.C. § 12117 (incorporating exhaustion requirement set forth for claims brought under Title VII to claims brought under Title I); see also McInerney, 505 F.3d at 138. Having failed to comply with these requirements by bringing her charge of disability discrimination to the EEOC, Hinton falls back on Title II, which contains no similar exhaustion requirements. One circuit has held that an employee of a public entity may bring an employment

York State law are still evaluated through a burden shifting test similar to that applicable under the ADA. See Stephenson v. Hotel Employees & Restaurant Employees Union Local 100 of the AFL-CIO, 6 N.Y.3d 265, 270 (2006); Jordan v. Bates Advertising Holdings, Inc., 848 N.Y.S.2d 127, 129 (N.Y.A.D. 1st Dept. 2007). Although New York law has a more expansive definition of disability, it still requires that the plaintiff establish that the allegedly injurious acts were suffered "because of the actual or perceived . . . disability." N.Y.C. Admin. Code § 8-107(1)(a). If Hinton fails to establish a prima facie case of discrimination, even if she were considered disabled under state but not federal law, her state claim would fail. See Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 169 n.2 (2d Cir. 2006) (dismissing a disability discrimination claim, notwithstanding New York's more expansive definition of disability, because plaintiff still could not meet the other elements of the burden shifting test); Graves, 457 F.3d at 184 n.3.

discrimination claim under either Title I or Title II of the ADA. <u>Bledsoe v. Palm Beach County Soil & Water Conservation Dist.</u>, 133 F.3d 816, 820 (11th Cir. 1998). At least three circuits have assumed without analysis that Title II applies to employment discrimination claims. <u>See Davoll v. Webb</u>, 194 F.3d 1116, 1130 (10th Cir. 1999); <u>Holmes v. Tex. A & M Univ.</u>, 145 F.3d 681, 683-84 (5th Cir. 1998); <u>Doe v. Univ. of Md. Med. Sys. Corp.</u>, 50 F.3d 1261, 1264-65 (4th Cir. 1995). The Ninth Circuit, however, after extensive analysis, has held that Title II does not apply to employment discrimination claims. <u>See Zimmerman v. Oregon Dep't of Justice</u>, 170 F.3d 1169, 1173-80 (9th Cir. 1999). Although the Second Circuit has yet to address this issue, district courts in this Circuit have been split.[22]

Even assuming Title II is applicable to Hinton's situation, it is also unclear whether Title II could validly abrogate the State of New York's sovereign immunity. Title II validly abrogates a states' sovereign immunity "insofar as [it] creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment." <u>United States v. Georgia</u>, 546 U.S. 151, 159 (2006) (emphasis in original). The Supreme Court has recognized Congressional prerogative to validly abrogate state sovereign immunity when its "chosen remedy" is "congruent and proportional" to its object of enforcement. <u>See Tennessee v. Lane</u>,

---

[22] For recent decisions holding that Title II does not apply to employment discrimination claims, <u>see</u> <u>Fleming v. State Univ. of N.Y.</u>, 502 F. Supp. 2d 324, 333 (E.D.N.Y. 2007); <u>Ayantola v. Cmty. Technical Colls. of the State of Conn.</u>, No. 3:05 Civ. 957, 2007 WL 963178, at *2 (D.Conn. Mar. 30, 2007); and <u>Syken v. New York</u>, No. 02 Civ. 4673, 2003 WL 1787250, at *6-10 (S.D.N.Y. April 2, 2003). For recent cases holding that Title II does apply to employment discrimination claims, <u>see</u> <u>Olson v. New York</u>, No. 04 Civ. 0419, 2005 WL 5885368, at *5 (E.D.N.Y. March 9, 2005); <u>Trans. Workers Union of America, Local 100, AFL-CIO v. New York City Transit Authority</u>, 342 F. Supp. 2d 160, 173 (S.D.N.Y. 2004); <u>Simms v. City of New York</u>, 160 F. Supp. 2d 398, 400 n.1 (E.D.N.Y. 2002); and <u>Winokur v. Office of Court Admin.</u>, 190 F. Supp. 2d 444, 448-49 (E.D.N.Y. 2002).

541 U.S. 509, 531 (2004). The extent to which Title II validly abrogates New York's sovereign immunity is an open question. See Press v. State Univ. of N.Y. at Stony Brook, 388 F. Supp. 2d 127, 135 (E.D.N.Y. 2005) (collecting cases). Defendants point to district courts in this Circuit that have dismissed Title II claims involving non-fundamental rights as barred by the Eleventh Amendment. (See D. Mem. 23-24.) Plaintiff, for her part, insists that she has a constitutionally protected property interest in her tenured employment and in having her application for promotion reviewed in accordance with proper procedures, as established by contract. (P. Reply 21-22.)

It is unnecessary to decide whether Hinton has an ADA-recognized disability, and if so, whether she can bring an employment discrimination case pursuant to Title II, and if so, whether Title II validly abrogates New York's sovereign immunity. Even assuming for the sake of this motion that all of these issues would be resolved in Hinton's favor, her disability discrimination claim still must be rejected on the merits because she cannot establish a prima facie case of discrimination on the basis of disability. Although a reasonable factfinder could conclude that Reynolds was aware of Hinton's medical condition, no reasonable factfinder could conclude that he, or anyone else, discriminated against her on the basis of that condition.

To recover money damages under Title II, Hinton must demonstrate that the challenged actions were "motivated by discriminatory animus or ill will based on plaintiff's disability." Garcia v. State Univ. of N.Y. Health Scis. Ctr., 280 F.3d 98, 111 (2d Cir. 2001). Assuming that Hinton can bring an employment discrimination case pursuant to Title II, her claim remains "subject to the familiar burden-shifting analysis" applicable to claims under Title VII. Sista v. CDC Ibis North America, Inc., 445 F.3d 161, 169 (2d Cir. 2006); see also Garcia, 280 F.3d at

112. To succeed in establishing a prima facie case, plaintiff must show that (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered adverse employment action because of her disability. Sista, 445 F.3d at 169; Margrave v. Vermont, 340 F.3d 27, 34-35 (2d Cir. 2003); Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001). If she establishes her prima facie case, defendants must "offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge[] and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." Sista, 445 F.3d at 168.

In support of her disability claims, Hinton's briefing focuses entirely on the words and actions of Reynolds. As proof of discrimination, Hinton points to Reynolds's letters suggesting that they "explore options" for Hinton to apply for disability retirement. Hinton informed Reynolds that she did not wish to explore these options. Hinton characterizes Reynolds's actions as attempts to "lure" her into taking early retirement. Assuming that she had a disability, or that Reynolds thought that she had a disability, all that Reynolds stated to Hinton was that he was willing to help her explore any disability benefits and accommodations available to CCNY employees.

As the Second Circuit has pointed out, in many situations an employer's actions "can be ascribed to discrimination no matter what the supervisor does." Alfano, 294 F.3d at 377. At his deposition, Reynolds insisted that he was trying to communicate to Hinton that:

> if her [medical] situation was so grave and desperate and, as she
> notes in her own email . . . , so demanding and difficult and
> overwhelming for her on a daily basis, that we should go together,
> with me as her chair, supporting her, to see if there was some

> mechanism within the CUNY benefits package for one to take a
> disability retirement from full-time teaching and still be able to
> teach, say, one course. A graduate course, for example.

(Reynolds Dep. at 130.)  Of course, a reasonable factfinder could choose to disbelieve

Reynolds's motives as he described them.  However, if Reynolds had not stated to Hinton his

willingness to explore options to accommodate Hinton's medical condition, especially since she

had recently communicated to him her inability to perform certain activities and because she had

recently been on some form of disability leave, he could have just as easily been accused of

refusing to accommodate her medical condition as she described it.  If other evidence in the

record supported the inference that Reynolds harbored some discriminatory animus against

Hinton on the basis of her disability, then perhaps Reynolds's comments could be considered in

the totality of the circumstances to support an inference of discrimination.  Standing alone,

however, an expression by Reynolds of his willingness to explore methods of accommodating

Hinton's alleged disability, including retirement if she desired to pursue that option, is not

evidence of discriminatory animus.

Moreover, Hinton points to no evidence that links any alleged hostility to her disability to

the denial of her promotion, or to any other allegedly adverse employment action.  Hinton has

submitted no evidence to rebut Reynolds's sworn statement that he had no involvement in the

denial of Hinton's untimely 2003 application.  (Reynolds Decl. ¶¶ 15-16)  More than a two year

gap exists between these conversations and Hinton's second application for promotion, in which

Reynolds participated.  The absence of any direct evidence of intent to discriminate on the basis

of disability, combined with the large gap in time between these conversations and Hinton's

second application, would lead any reasonable factfinder to conclude that Hinton has not even

made out a prima facie case that the failure to promote her on the basis of her first or second applications for full professorship was because of her disability.[23] Her disability discrimination claims cannot withstand summary judgment.[24]

## IV. Retaliation

Hinton alleges not only that she has been discriminated against on the basis of gender and disability, but that she has been retaliated against for engaging in protected conduct. Title VII forbids employers from retaliating against an employee "because [she] has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The anti-retaliation provisions are violated when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." Terry, 336 F.3d at 141 (citation and internal quotation marks omitted).

---

[23] Nor could a reasonable factfinder accept Hinton's claim of a hostile work environment on account of disability. First, for the reasons already stated, Hinton's grab-bag of grievances does not amount to a hostile work environment. Second, nothing in the record links any of those grievances in any way to any disability.

Hinton's only specific grievances that relate in any way to illness are inconsequential. Hinton complained about being asked to observe adjunct faculty. However, when she told Reynolds that she was unable to perform the work, she was allowed to avoid the responsibilities, and suffered no adverse consequence. (Hinton Dep. at 87.) Hinton also points to allegedly unequal treatment that she received when she called in sick – with the flu. Hinton has not demonstrated that she suffered in any way from whatever procedures she was asked to follow, nor offered evidence to support her speculation that others were not subject to the same procedures. Nor is there any evidence tying this incident to Hinton's alleged disability: she was calling regarding the flu, not her chronic fatigue syndrome or irritable bowel syndrome.

[24] Because Hinton has not put forward any evidence to suggest that she was discriminated against because of her medical condition, Hinton's state law claims fail alongside her federal claims. See Stephenson, 6 N.Y.3d at 270; Sista, 445 F.3d at 169 n.2; Graves, 457 F.3d at 184 n.3.

A.  Legal Standards

The familiar burden shifting analysis applies here as well.  Terry, 336 F.3d at 141.  To

state a prima facie case of retaliation under Title VII, the plaintiff must make a de minimis

showing that (1) she engaged in a protected activity, (2) the defendant knew of the action taken,

(3) the defendant took an adverse action against the plaintiff, and (4) there was a causal

connection between the protected activity and the adverse action – "i.e., that a retaliatory motive

played a part in the adverse employment action."  Kessler v. Westchester County Dep't of Soc.

Servs., 461 F.3d 199, 205-06 (2d Cir. 2006) (citation and internal quotation marks omitted); see

also Woodman v. WWOR-TV, 411 F.3d 69, 76 (2d Cir. 2005); Quinn v. Green Tree Credit

Corp., 159 F.3d 759, 769 (2d Cir. 1998); Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir.

1995).  In order to constitute protected activity for the purposes of the anti-retaliation provisions

of Title VII, the plaintiff's complaint does not have to be correct that the conduct complained of

was actually illegal, so long as the complaint was made with the good faith and reasonable belief

that it was.  Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593

(2d Cir. 1988).[25]  If a plaintiff establishes a prima facie case, the burden shifts to the defendant to

articulate a legitimate, non-retaliatory reason for the employment action.  See Terry, 336 F.3d at

138.  Once articulated, the plaintiff must, through admissible evidence, show that retaliation was

a substantial reason for the adverse action, and that the employer's articulated reasons for the

action are merely a pretext for retaliation.  Id.  The elements necessary to establish a claim under

_____

[25] Hinton has submitted substantial amounts of hearsay statements that may be used to
evaluate whether she had a good faith and reasonable belief for her complaints.  The hearsay
statements are admissible not for the truth of the matter asserted, but to establish what Hinton
thought at the time she filed her complaints.

Title VII's retaliatory provision are consonant with the elements necessary to establish a claim under the SHRL and CHRL.  See Forrest, 3 N.Y.3d at 312-13.

The Supreme Court has held that "the anti-retaliation provision [of Title VII], unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."  Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. ----, 126 S.Ct. 2405, 2412-13 (2006).  To support a claim of retaliation under Title VII, therefore, Hinton must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. at 2415 (citation and internal quotation marks omitted); see also Kessler, 461 F.3d at 207-09.

B.     Protected Activity

A reasonable factfinder could conclude that Hinton has engaged in protected activity numerous times during her employment at CCNY.  Hinton has had a history of complaining regarding alleged ill-treatment, and a reasonable factfinder could conclude that these complaints were made in good faith.  When Willner was chair he was carbon copied on Hinton's EEOC complaint naming Reynolds.  (Willner Dep. at 15.)  A reasonable factfinder could further conclude that other members of the administration, including Reynolds, knew that Hinton had engaged in protected activity.  Some of Hinton's confidential complaints ended up in her personnel files, housed in cabinets in the English Department accessible to other faculty members.  (Id. at 18-22; Reynolds Dep. at 157-59.)  A reasonable factfinder could conclude that

it was Reynolds who placed those complaints in the file.[26]  Reynolds testified that it was "widely known" in the Department that Hinton had sued him (Reynolds Dep. at 100), and a reasonable factfinder could also conclude that it was widely known in the Department that Hinton filed EEOC grievances against him in advance of this suit, and that some people were not very happy with Hinton regarding her complaints.  In the context of a formal meeting with the administration, Hinton was told that she was a "problem in the community" (id. at 53), and a reasonable factfinder could conclude that her "alleged reputation for being quarrelsome [was] based on her tendency to file non-frivolous [EEOC] complaints," Terry, 336 F.3d at 140 n.11.  In any event, to establish her prima facie case, Hinton need only demonstrate general corporate knowledge of her protected activity.  Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000) ("Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity."); accord Kessler, 461 F.3d at 210.

C.     Failure to Promote

Thus, a reasonable factfinder could easily find that Hinton had engaged in protected activity known to Reynolds and other members of the administration.  Moreover, it cannot be doubted that a denial of promotion is the sort of adverse action that could "dissuade[] a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 126 S.Ct. at 2415.  Accordingly, whether seen as an aspect of plaintiff's prima facie case or as a refutation of defendants' claims of legitimate non-retaliatory reason for the failure to promote

---

[26]  When asked whether he had put the EEOC files in the cabinet Reynolds stated:  "I am not ontologically [sic] certain, but I don't think that I did."  (Reynolds Dep. at 159.)

Hinton, the remaining issue is whether plaintiff can establish a causal link between her protected objections to the discrimination and the denial of her promotion. The inquiry here largely overlaps the similar discussion above with respect to plaintiff's of claim sex discrimination, and leads to the same conclusions.

No reasonable factfinder could conclude that Hinton's first application was denied for retaliatory reasons. Her arguments fail here largely for the same reasons that they failed in the context of her arguments that this application was rejected because of discriminatory animus. To establish a prima facie case, Hinton must submit evidence not only that she suffered an adverse employment action, but that there was a causal connection between the protected activity and the adverse action.

As noted above, defendants offer powerful evidence that Hinton's first application was denied for the legitimate, non-retaliatory reason that it was made too late. Hinton cannot demonstrate that she was misled into filing late by someone motivated by a discriminatory or retaliatory animus; while her anti-discrimination activities were widely known within the English Department, there is no evidence that it was known to, or resented by, the Faculty Affairs functionary who provided Hinton with alleged misinformation about the filing deadline. While Hinton offers direct evidence of a retaliatory animus on the part of Reynolds, there is no evidence linking him to the decision to deny her first application as untimely. Reynolds has sworn that he was not present at the promotions committee meeting that considered Hinton's

first application, and played no role in its denial. (Reynolds Decl. ¶ 15.)[27] Hinton offers no evidence to the contrary of any sort.

Finally, Hinton provides no evidence to suggest that it was even theoretically possible for such a late application to be considered on its merits in the compressed time period that existed. Accordingly, no reasonable juror could conclude that the rejection of Hinton's first application was the result of retaliation, or of anything other than her late application.

In contrast, a reasonable factfinder could conclude, with ease, that there was a causal connection between Hinton's protected activity and the denial of her second promotion. This application was timely submitted and rejected on the merits. Either during or after that application process, Jane Marcus asked Reynolds why he was harassing Hinton and "what did she ever do to you?" (Marcus Dep. at 34.) In response, Reynolds "gestured to . . . file cabinets" and said "that's what she did to us, these two file cabinets." (Id.) A reasonable factfinder could conclude that Reynolds knew that Hinton filed a complaint against him, and knew that a report of that complaint was mistakenly or purposefully placed in Hinton's file.

Hinton's evidence of retaliation is bolstered by the affidavit of Lyn Di Iorio, who stated that Reynolds "openly violated CCNY's confidentiality requirement regarding [affirmative action] complaints by . . . disclosing at a meeting of the English Department the fact that [she] had filed an Affirmative Action complaint." (Di Iorio Aff. ¶ 4.) Di Iorio then complained to the affirmative action officer that Reynolds, then the Department chair, violated CCNY's policy

---

[27] He declared that Abrams "sought [his] advice" when she received Hinton's tardy notice of intention to seek promotion, but he "did not provide any advice regarding the application, but, rather, referred her to the Dean for Faculty and Staff Relations, John Snyder." (Reynolds Decl. ¶ 16.)

guidelines.  (Id.)  Later, when Di Iorio tried to talk with Reynolds, who in the interim had been promoted to Associate Dean of Humanities, regarding her hopes of seeking tenure, Reynolds told her "that [she] would not be tenured, much less promoted, because [she] had filed an Affirmative Action complaint, and because [she] had complained to the Affirmative Action officer about [Reynolds's] public comments."  (Id.)  Such evidence of similar retaliatory threats against Di Iorio is relevant to establish Reynolds's intent with respect to Hinton.  Moreover, there is evidence that Jane Marcus was demoted only weeks after providing deposition testimony helpful to Hinton in this lawsuit (id. ¶ 10), providing further evidence from which a reasonable juror could conclude that women in Reynolds's division who complain about alleged discrimination are punished.

A reasonable factfinder could conclude, based on Hinton's evidence, Marcus's testimony, and Di Iorio's affidavit, that Reynolds, as Dean of Humanities, had influence over the promotions process regarding candidates from within his division, and was motivated to (and did) use his influence at various stages of the evaluations process to derail Hinton's application. Reynolds chaired the divisional committee that recommended against Hinton's promotion, and then presented her case to the college-wide review committee, which also recommended that President Williams deny her promotion.   (Reynolds Decl. ¶¶ 21-22.)  Willner testified, as a reasonable factfinder could infer in any case, that the person who presents the candidate's case at each level of review has considerable influence over the outcome.  (Willner Dep. at 63.)  A reasonable juror could see more than mere coincidence in the fact that every time Reynolds was a member of a committee that evaluated Hinton's application, the application received a negative recommendation.  During the course of Hinton's second and third applications for promotion,

which, according to Reynolds, were largely of equal caliber, it was only when Reynolds was not involved in the decisionmaking process that Hinton received positive recommendations. On this record, a reasonable factfinder could conclude that Reynolds harbored animus against Hinton because she was filing complaints against him, and that Reynolds's animus "play[ed] a part" in the failure to promote Hinton on the basis of her second application, "whether or not it was the sole cause." Terry, 336 F.3d at 141. Even if a reasonable juror did not conclude that Williams himself was motivated by retaliatory animus, such a reasonable juror could still conclude that Williams relied upon the recommendation of Reynolds, Dean of Humanities, regarding a candidate from his own division.

Defendants' claim that Hinton's second application for promotion was denied solely on the basis of her academic credentials is as unconvincing in rebutting her prima facie case of retaliation as it was in rebutting her prima facie case of gender discrimination. A reasonable jury could accept the opinion of Hinton's numerous supporters that her second application merited promotion, and note that both the English Department and President Williams decided to promote Hinton based on her third application, which Reynolds testified was roughly the same as her second application. Thus, there are genuine issues of material fact regarding whether Hinton was qualified for the position at the time of her second application, and whether defendants have offered a legitimate, non-retaliatory rationale for its denial.

### D. Other Actions

Hinton insists that her "room assignments, grant applications, and committee assignments" constitute potentially "less flagrant reprisals" than the denials of her promotion applications, but are reprisals nonetheless that a reasonable juror could conclude "'might have

dissuaded a reasonable worker from making or supporting a charge of discrimination.'" (D. Reply at 19, quoting <u>Burlington Northern</u>, 125 S.Ct. at 2415.) In light of <u>Burlington Northern</u>, the Second Circuit has recently held that, to make out a claim of retaliation for engaging in protected activity, a "materially adverse" action need not involve any "change in . . . salary, benefits, job title, grade, or hours of work," but need only "dissuade[] a reasonable worker from making or supporting a charge of discrimination." <u>Kessler</u>, 461 F.3d at 201, 208, quoting <u>Burlington Northern</u>, 126 S.Ct. at 2415 (internal quotation marks omitted). In <u>Kessler</u>, after engaging in protected activity, the plaintiff was transferred to a new position where he had the same pay and rank but a substantial decrease in his job responsibilities and administrative assistance, and the court found that his retaliation claims survived summary judgment. <u>Kessler</u>, 461 F.3d at 202-04.

As is made clear by <u>Burlington Northern</u>, Title VII's core anti-discriminatory provisions are narrower than Title VII's retaliation provisions and what might not qualify as an adverse employment action under Title VII's anti-discrimination provisions may still violate Title VII's anti-retaliation provisions. 126 S.Ct. at 2411. Moreover, even a single act of retaliation, if it satisfies the Burlington Northern standard, can create liability, even if it is an isolated act that does not amount to the sort of "pervasive" harassment necessary to create a hostile work environment. Accordingly, the fact that the various actions complained of by Hinton were insufficient to support a claim of discrimination or to permit a reasonable jury to find a hostile work environment does not mean that they necessarily fail to amount to illegal retaliation.

Nevertheless, most of Hinton's complaints cannot support a retaliation claim, either because they are too trivial to intimidate a reasonable person or because they cannot plausibly be

attributed to retaliation. Defendants present evidence that classroom assignments are the province of the Registrar (Reynolds Decl. ¶ 33), and Hinton offers no evidence either that the Registrar had a retaliatory motive or that Reynolds, or anyone else about whom she complained, influenced the Registrar's actions. And Hinton's dissatisfaction with her course assignments are either too nebulous or too trivial to permit a finding of retaliation.

Two matters on Hinton's list, however, are of potentially greater significance. A reasonable jury could conclude, as did Hinton, that in the English Department, the funding process and the hiring process are the "two ways in which you are acknowledged as a valued and important colleague," and that Hinton has been "excluded from . . . those processes." (Hinton Dep. at 158.) Exclusion from such critical indicia of full participation, a jury could find, could deter a "reasonable [professor] from making or supporting a charge of discrimination." Here, a reasonable juror could conclude that Hinton had been cut off from important parts of the English Department's system of rankings and benefits so as to punish her for and to deter other colleagues from complaining about alleged acts of discrimination. A reasonable factfinder could conclude, for example, that Hinton was denied membership in a hiring committee as part of Reynolds's discriminatory actions against her. (Hinton Dep. at 61.) Even though Abrams was chair at the time, she told Hinton that it "had been Fred Reynolds's call" to pick who was on the search committee. (Id. at 61.) Hinton also pointed to evidence suggesting that Reynolds cut off funding that had been promised to Hinton to fund an ongoing poetry series. (Id. at 165.) Although the amount was small, and the money did not go to Hinton personally, nonetheless, a reasonable factfinder could conclude that the denial of promised funds to a professor to put on a lecture series highlighting colleagues of hers and work that she finds important constituted a

significant act of retaliation. Although these events are insufficient in gravity to constitute materially adverse employment actions or central aspects of a hostile work environment sufficient to trigger the substantive provisions of Title VII, nonetheless there remains a genuine factual issue about whether these actions would tend to discourage a reasonable worker from engaging in protected activity.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied as to plaintiff's claims of retaliation and sex discrimination with respect to her second application for promotion and as to her claims of retaliation with respect to her exclusion from the funding and hiring process in the English Department, and granted in all other respects.

SO ORDERED.

Dated: New York, New York
       February 29, 2008

GERARD E. LYNCH
United States District Judge

57